# UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

JOHN GILLIES
a/k/a "Robert Burgess," and
a/k/a "David Martino"

## CRIMINAL COMPLAINT

CASE NUMBER: 03m-1084-JGD

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about May 15, 2003 through on or about May 28, 2003 in Norfolk and Middlesex counties, in the District of Massachusetts, and in the Southern District of California, defendant did, (Track Statutory Language of Offense)

knowingly and intentionally possess with intent to distribute a quantity of marijuana, a Schedule I controlled substance,

in violation of Title 21 United States Code, Section(s) 841(a)(1).

I further state that I am a(n) Drug Enforcement Administration and that this complaint is based on the
Official Title
following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof: X Yes ☐ No

Signature of Complainant
**KEVIN C. HERSEY**
Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

May 29, 2003 at Boston, Massachusetts
Date City and State

Judith G. Dein
Name and Title of Judicial Officer
**JUDITH G. DEIN**
**UNITED STATES MAGISTRATE JUDGE**

Signature of Judicial Officer

John Gillies 03M-1034-JGD

**AFFIDAVIT OF KEVIN C. HERSEY**

Special Agent Kevin C. Hersey deposes and states as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration (DEA). I have served in this capacity for over 14 years and am currently assigned to the Boston, Massachusetts Division Office. During my tenure as a Special Agent, I have worked on hundreds of drug investigations. I have written and/or participated in the execution of numerous search warrants resulting in ~~the~~ seizures, including large quantities of controlled substances; packing implements and other paraphernalia involved in the manufacture and distribution of controlled substances; large amounts of United States currency, ledger books, back records, telephone books, receipts, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances. The information contained in this affidavit was either observed by me or related to me by other law enforcement officers involved in this investigation.

2. I submit this affidavit in support of a criminal complaint charging **John J. GILLIES, a/k/a "Robert Burgess,"** and **a/k/a "David Martino" ("GILLIES")** with possession with intent to distribute marijuana in violation of 21 U.S.C. §841(a)(1); and in support of a finding of probable cause to believe that evidence of marijuana and/or controlled substances can be found at The Storage

Shedd, 275 Bailey Street, Canton, MA, Unit #418 ("Unit #418").

The premises are further described as ~~set forth in Attachment A:~~ KG

> a single, tan metal, commercial storage unit located in the middle of "Building C", a large structure containing multiple, similarly designed storage units at The Storage Shedd in Canton, MA. The number "418" is visible above the entrance or doorway to this particular storage unit. The doorway is also metal, brown in color, and is opened by rolling the door upwards into the ceiling of the facility.

3. This affidavit includes a summary of events that I am personally familiar with as well as observations and knowledge related to me by other DEA and task force agents, and other law enforcement personnel that have participated in this investigation. This affidavit does not set forth all the facts developed during this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that GILLIES's committed the above mentioned offenses and the aforementioned locations contain marijuana or other narcotics, U.S. currency, documents and other records detailing the purchases of marijuana or other narcotics, documents confirming travel and telephones or communication devices used to facilitate the distribution of narcotics; or other evidence of violations of 21 U.S.C. 841(a)(1).

**Case background: suspicious crate shipped from southern California to Dracut, MA *via* Old Dominion Freight Lines**

4. This investigation was initiated on or about May 16, 2003 when the Director of Security at Old Dominion Freight Line ("Old Dominion") in High Point, North Carolina alerted local law enforcement of a suspicious crate that had been given to Old Dominion in southern California for shipment to Dracut, Massachusetts.

5. Officials at Old Dominion provided High Point, North Carolina law enforcement with the Bill of Lading for the suspicious crate. The Bill of Lading indicated that the "shipper" of the crate was *Underwater Equipment Sales* of 317 Catalina Court in Point Loma, CA, and that the "recipient" of the crate was *DVP Diving and Video* at 33 Silva Lane, Dracut, MA.[1] The Bill of Lading also contained two (2) telephone numbers for the shipping party, *Underwater Equipment Sales* -- 619-980-0807, and a toll free number, 800-329-3324.

6. Thereafter, North Carolina law enforcement "checked out" the identity of the "shipper," as well as the identity of the "recipient" of the crate. They learned that the "shipper's" address did <u>not</u> exist, and that no business named *Underwater*

---

[1] 33 Silva Lane is the business address for the Old Dominion facility in Dracut, MA; not for DVD Diving and Video.

*Equipment Sales* could be found in commercial data bases. Likewise, investigators were unable to find any business in Massachusetts operating under the name *DVP Diving Studio.* As stated above, the recipient's (*DVP Diving and Video)* address was the freight office for Old Dominion in Dracut, Massachusetts; not an address, commercial or otherwise for *DVP Diving and Video.* Based on my training and experience, I know that this particular technique, sending drugs and contraband to and from fictitious addresses, is frequently used by drug traffickers to ship illegal controlled substances.

7. Based on the foregoing, agents in North Carolina obtained a search warrant for the crate. A subsequent search of the crate revealed that it contained four (4) locked containers, each of which contained marijuana. Almost 235 pounds of a green, leafy substance consistent in odor and appearance with marijuana, were, ultimately, found in the four containers within the crate.[2]

8. After discovery of the marijuana inside the crate, North Carolina investigators contacted DEA in Boston and spoke with me. After listening to the above scenario, myself and other agents decided to have the crate transported to Boston with designs on carrying out a controlled delivery of the crate and drugs to the

---

[2] Based upon my training and experience, 235 pounds of marijuana is consistent with sale and distribution of the drug and not personal use.

intended target(s).

**Thursday, May 22, 2003**

9. On Thursday, May 22, 2003, the crate was transported to DEA Boston via DEA aircraft from Greensboro, NC. Thereafter, I contacted the Old Dominion freight facility in Dracut, MA (the intended destination of the crate), and arranged with Old Dominion to deliver the crate to their Dracut facility on Friday, May 23, 2003. After receipt of the crate, I then directed Old Dominion to call the "consignee phone number" provided in the Bill of Lading, (781) 244-2154, and inform the party that the crate had, in fact, arrived in Massachusetts.

**Tuesday, May 27, 2003**

10. On Tuesday morning, May 27, 2003, at approximately 8:00 a.m., Old dominion received a call from an unidentified male inquiring about the crate. The caller was advised that the crate had, indeed, arrived at Old Dominion in Dracut, and would be available for pickup after noon that day. The caller remarked that if he could not pick up the crate that day, Tuesday, he would come to Old Dominion to pick up the crate the following day, Wednesday, May 28.

11. At approximately 7:20 p.m. on Tuesday, a white, middle aged male -- later identified as defendant GILLIES -- arrived at Old Dominion driving a rented *U-Haul* van, and spoke with TFA

Shawn Murray ("Murray"); an undercover officer posing as a Old Dominion employee.[3] GILLIES handed Murray the original Bill of Lading for the crate (at issue) and told Murray that he was here to pick a crate. Murray told GILLIES that GILLIES owed Old Dominion money for the shipping and asked GILLIES for his driver's license. GILLIES handed Murray a New York State driver's license in the name of "Robert Burgess" of 774 Elizabeth Street, Utica, NY. However, the Burgess' license depicted a photograph of GILLIES. Shortly afterwards, GILLIES handed Murray the exact amount of money owed Old Dominion in cash -- $359.02

12. In the course of their conversation, Murray asked GILLIES if he worked for "*DVP*." GILLIES answered "yes," but that he was only picking up the crate. GILLIES also told Murray that he was "late" picking up the crate, because "they" had been out "working" all day. In response to this remark, Murray asked GILLIES what he did for "work." This time, GILLIES answered that he was a "mover"; a response inconsistent with his earlier affirmative response to Murray's question whether he worked for "*DVP*."

13. After Murray took payment for the crate's shipping, and made a xerox copy of the "Burgess" New York state driver's

---

[3] In a subsequent conversation with Murray on May 27, GILLIES told Murray that he had rented the U-Haul van in Lynn, MA.

license, GILLIES asked Murray if he could measure the crate to be sure that it would fit inside his truck. (GILLIES mentioned that he was not sure whether his rented truck would be big enough to contain the crate.) Murray said that would be okay and, moreover, told GILLIES that he (Murray) wanted GILLIES to carefully examine the crate because the crate had been accidently dropped from a fork lift. GILLIES replied, "you dropped it?" Murray stated "yes" but told GILLIES that the crate did not appear to be damaged. Murray pressed GILLIES to examine the crate because since the crate had been clearly marked "FRAGILE," and because the Bill of Lading reflected that it contained "test equipment," Murray was concerned that its contents may be damaged. GILLIES responded, "it should be fine, they pack them up good." GILLIES also stated that he was "sure it was fine," since "there was nothing breakable in there."

14. Following this exchange, Murray and GILLIES walked to the loading dock area for the purpose of identifying and locating the crate. While Murray pretended not to know *where* the crate was located, or *what* the crate looked like, GILLIES, from almost 25 feet away, pointed to the crate and said, "there it is." (Murray, later, related to me that other than one or two red *FRAGILE* stickers, and two computer printout sheets unreadable from their vantage point, there were no distinguishing marks on

the crate.)

15. After locating the crate, Murray (and the fork lift driver) assisted GILLIES in loading the crate into the *U-Haul* van. After several attempts, they were unable to squeeze the crate into the rented van. As a result, GILLIES told Murray that he would try to get a bigger truck and would come back to Old Dominion the next day. Murray told GILLIES that he (Murray) was only working to 3:00 p.m. on Wednesday. In response, GILLIES told Murray that either himself or someone else would be there (at Old Dominion) by 3:00 p.m. the next day.

16. After departing Old Dominion in the U-Haul van, GILLIES was followed by agents to a U-Haul rental facility located in Somerville, MA. Surveillance agents observed GILLIES arrive at the U-Haul facility at 8:15 p.m. and drop off the van. Approximately three to five minutes later, agents observed GILLIES inside the back seat of a grey, Ford Taurus (MA Registration RT1132) that was parked adjacent to the U-Haul facility.[4] GILLIES was observed sitting in the back seat of the parked Taurus for almost ten (10) minutes in the company of two (2) white males seated in the front seat. After that, GILLIES exited the grey Taurus, walked a short distance to a red, Buick

---

[4] The grey Ford Taurus is registered to John Ryan, Jr., 62 Country Club Drive, Dedham, MA.

Riviera (Ma. Reg 7515WH) that was registered to John Gillies, 18 Emmanuel Street, Revere, MA. GILLIES was followed to a convenience store on Main street in Malden, MA where he made a telephone call at a public payphone. After GILLIES departed the store, surveillance was interrupted. As short time later, the red Buick Riviera was spotted parked adjacent to 28 Walnut Street, Malden, MA.

**Wednesday, May 28, 2003**

17. At approximately 5:05 p.m. on May 28, 2003, GILLIES returned to the Old Dominion facility in Dracut. This time, however, GILLIES was operating mid-size *Penske* rental moving vehicle.[5] GILLIES entered the office, approached Murray. Murray asked GILLIES if he had a bigger truck. GILLIES replied, "yes." Murray asked GILLIES if *he* (GILLIES) had to pay for the other truck (the U-Haul van). GILLIES replied the company whose "stuff" that he was picking up was paying. Murray then said to GILLIES, "I thought you said you worked for them?" GILLIES replied, "I work for *Bain Movers* on the Lynn Way in Lynn," that he did moving "side-jobs," and that was what he was doing there.

18. After GILLIES backed his truck up to the loading dock

---

[5] About 12:30 p.m. on May 28, employees of Old Dominion received a call from an unidentified male who inquired about the crate and stated that he had been there the previous day, and that he had dealt with "Shawn." The male also stated that he could not be there until 5:00 p.m.

and while the crate was loaded into the *Penske* truck, Murray asked GILLIES what kind of work "*DVP*" did. GILLIES said he did not know. When Murray asked GILLIES whether he (GILLIES) expected to get caught in traffic, GILLIES said that he thought he would, because he was taking the crate to Lynn in order to store it at the *Bain* warehouse overnight. Moreover, GILLIES added, someone else would be picking up the crate tomorrow (Thursday) in order to deliver the crate to "Martha's Vineyard." When Murray asked GILLIES why the crate was going to Martha's Vineyard, GILLIES stated that is where the company is located; referring, I believe, to *DVP Diving and Video*. Finally, when Murray commented that the Vineyard was a good place for a diving business, GILLIES agreed with him.

**Surveillance of GILLIES from Dracut to the Storage Shedd (Unit #418**

19. At approximately 5:20 p.m., GILLIES departed Old Dominion and headed south on Route 93. At approximately 8:00 p.m., GILLIES and the *Penske* truck were surveilled entering the parking lot of a liquor store in Canton, MA (some 20 to 30 miles south of Lynn, MA). The *same* grey Ford Taurus observed the previous night in Somerville, MA (and containing two occupants) was also in the parking lot. Within a minute, the grey Taurus exited the parking lot followed by GILLIES and the *Penske* truck.

At approximately 8:15 p.m., both vehicles arrived at the Storage Shedd located at 275 Bailey Street in Canton, MA.

20. A short time later, I observed GILLIES exit the *Penske* truck and approach a digital keypad at the entrance of a security gate surrounding a very large number of individual storage units all contained in three (3) separate buildings. While GILLIES stood over the keypad (and appeared to be touching buttons on the keypad as if he was entering a code) the gate began to open. GILLIES then re-entered the *Penske* truck, drove into the gated area (followed by the Grey Taurus), proceeded to Unit #418 where he parked the truck.[6]

21. A short time after GILLIES exited the *Penske* truck, I approached him and engaged him in conversation. When I asked him his name, he replied "John Gillies"; a different name than the one he gave to Murray at Old Dominion. When I asked GILLIES what he was doing, he replied that "he was working." When I asked him what he did for work, he pointed to his T-shirt that read "Bain Moving Company." When I asked him what he was moving for "Bain," he replied, "I want a lawyer." When I told GILLIES that he was

---

[6] I learned from one of the employees of The Storage Shedd that the access code used by GILLIES to open the gate that evening was the same access code assigned to the lessee of Unit #418. I also learned that the lessee for Unit #418 was David Martino of 198 Beacon Street, Boston, MA. When I reviewed the Application for Use and/or Occupancy for Unit #418, I examined the xeroxed MA driver license for David Martino (and his photo) and concluded that the male depicted in the Martino license was GILLIES.

not under arrest and that I just wanted to know if he was moving furniture or something else, he repeated that he wanted a lawyer. After my conversation with GILLIES and based upon his conduct and statements of the preceding two days, I placed GILLIES under arrest.

**K-9 "sniff" at Unit #418**

22. At approximately 8:45 p.m., TFO (and Massachusetts State Police Trooper) Mark West presented his narcotics detecting K-9, "Tracer," at Building C, approximately 10 storage units away from Unit #418. As Tracer walked by the other units, she made no positive "alerts" to any of the storage units until she reached Unit #418. At Unit #418, and as she has been trained, Tracer alerted to the presence of a narcotic odor by sitting down next to the front door of Unit #418.

**Probable Cause to arrest GILLIES**

23. Based on the information contained in this Affidavit, all of which is true and accurate to the best of my knowledge, information and belief, there is probable cause to believe that GILLIES has violated 21 U.S.C. § 841(a)(1), and that he knowingly and intentionally possessed with intent to distribute the 235 pounds of, what agents believe to be, marijuana that was packed in four (4) containers and stored inside the crate that GILLIES collected at the Old Dominion facility in Dracut and then

"trucked" to Unit #418 at the Storage Shedd in Canton, MA.

24. I believe that GILLIES had knowledge of the contents of the crate based upon the following factors: **1)** GILLIES appeared not once, but twice, to collect the crate from Old Dominion that had been sent by a fictitious business in California to another fictitious business here in Massachusetts; **2)** when asked by Murray who he worked for, GILLIES stated, at various times, that he worked for "*DVP*" and, later, that he worked for *Bain Moving* in Lynn, MA; **3)** although GILLIES claimed he was just picking up the crate for the owners, he was able to identify the crate at a significant distance; perhaps suggesting that he had seen the crate before; **4)** After telling Murray that he was taking the crate to Lynn so that others could bring the crate to Martha's Vineyard the next day, he avoided Lynn, MA and drove the crate to a storage facility leased to him (under the assumed name, David Martino) in Canton, MA -- a storage facility that a narcotics detecting K-9 alerted to last night; **and 5)** GILLIES's provided Murray a false name (along with a fraudulent NY driver's license), but identified himself to your Affiant as John GILLIES; and 5) when questioned by Murray about possible damage to the contents of the crate, GILLIES indicated that there was nothing breakable inside - another fact suggesting that GILLIES knew what the crate contained.

**Probable Cause to search Unit #418 at the Storage Shedd**

25. Based on information contained in this Affidavit, there is *also* probable cause to believe that evidence ~~defined in Attachment C, and~~ relating to illegal possession with intent to distribute marijuana, in violation of 21 U.S.C. §§841(a)(1), may be found inside Unit #418 at the Storage Shedd, 275 Bailey Street, Canton, MA.

26. I believe that inculpatory evidence of GILLIES's marijuana activities may be found within Unit #418 for the same reasons set forth in paragraph 24, supra, and for these additional reasons: **1)** K-9 Tracer, a trained narcotics detection dog, positively alerted to the odor of a controlled substance next to the door of Unit #418, and after passing by a number of adjacent units where no detection was made; **2)** GILLIES was arrested just outside of Unit #418 with 235 pounds of suspected marijuana concealed in a crate that, logic dictates, GILLIES also intended to store inside Unit #418 along with additional contraband or drugs; **and 3)** the lease application for Unit #418 dates back to November 2002, and evidences multiple payments by "David Martino" (a/k/a GILLIES) to the Storage Shedd to cover storage expenses.

27. In light of this evidence, as well as my experience as a narcotics investigator, a search of Unit #418 at the Storage

Shedd in Canton, MA will, likely, produce evidence of marijuana, as well as drug packaging materials (plastic bags, elastics, heat sealers), scales, and quantities of U.S. currency (earned from illegal drug deals). In my experience, drug dealers selling marijuana (and other drugs) commonly keep drugs and drug packaging/processing materials at private, leased storage facilities, like the Storage Shedd, that restrict access to such units *only* to the documented lessee of that particular unit.[7] As such, the drug dealer can be assured that drugs, contraband, inculpatory drug ledgers and drug records, and other paraphanalia of the drug business are safe and secure within this type of private storage facility.

43. I also expect to find within Unit #418, detailed records, ledgers, and other writings documenting GILLIES' drug trafficking activities. Record keeping is important to keep track of monies paid and monies owed. Moreover, to be of assistance and value to a drug dealer, such records must be maintained close at hand and, therefore, at the dealers' home or in a secure storage facility where he can quickly determine

[7] Indeed, the Storage Shedd provided an additional layer of security by restricting access within the fenced-in area only to persons with assigned digital codes .

current credit and debit balances. These records, as well, can assist the dealer as long as they are readily accessible.

KEVIN C. HERSEY
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
this 29th day of May, 2003.

JUDITH G. DEIN
United States Magistrate Judge